UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN TRISVAN

                              Petitioner,

   - v. -

ROBERT ERCOLE,

                              Respondent.
------------------------------------------------------------x

OPINION AND ORDER

07-cv-4673 (NG)

**GERSHON, United States District Judge:**

On December 11, 1997, following a jury trial in the Supreme Court of the State of New York, Kings County (Hall, J.), petitioner John Trisvan was convicted of manslaughter in the first degree for killing Raheim Slaughter. He was sentenced to twelve and one-half to twenty-five years' imprisonment. His judgment of conviction became final on or about March 17, 2002. On November 1, 2007, Trisvan filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody in violation of his constitutional rights.

Because Trisvan's federal habeas petition was filed more than five years after his judgment of conviction became final, this court directed him to show cause why the petition was not barred by the one-year statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("ADEPA"). *See* 28 U.S.C. § 2244(d)(1). Trisvan submitted a *pro se* affidavit in response to the court's show-cause order and, after obtaining the assistance of counsel,[1] a supplemental response.

---

[1] Trisvan is being represented by the Capital Defender and Federal Habeas Clinic at Brooklyn Law School.

Through counsel, Trisvan acknowledges that his federal habeas petition was not filed within AEDPA's limitations period. He contends, however, that the statute of limitations was "equitably tolled" because evidence not presented at his trial establishes his "actual innocence."

As the Supreme Court recently confirmed, in "severely confined" circumstances, pleas of actual innocence can override AEDPA's statute of limitations. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928, 1933 (2013). Technically, this "gateway" to federal habeas review is not a species of "equitable tolling." *Id.* at 1931. Rather, actual innocence, if established, warrants an "equitable *exception*" to the statutory time bar. *Id.* To invoke the exception, a petitioner must make the same showing of actual innocence that would establish a miscarriage of justice sufficient to overcome a procedural bar to habeas review. *Id.* at 1928. The petitioner must show that, "in light of [] new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See id.* (internal quotation marks omitted). This standard is "demanding and seldom met." *Id.* (internal quotation marks omitted). For reasons that follow, it is not met here. Accordingly, the petition is dismissed as untimely.

## I. BACKGROUND

### A. Trisvan's Arrest and Confession

In the early morning hours of January 12, 1997, Raheim Slaughter, also known as "Rah," was shot inside Tamika Grayson's apartment in the Albany Houses, a New York City Housing Authority complex in Brooklyn. In the aftermath of the shooting, police interviewed several individuals who had been present at Grayson's apartment, including Todd Wilks. Wilks, who claimed to have witnessed the shooting firsthand, told investigators that Slaughter was shot in the back bedroom of Grayson's apartment by "Maino" and an accomplice Wilks did not recognize. The other witnesses—specifically, Grayson, Tiffany Ezell, Zaquan Jackson, and Melissa

Wallace—were not in the back bedroom when the shooting transpired. These witnesses were able to identify Maino as one of the assailants, but could not identify his accomplice.

Jermaine Cross, also known as "Maino," was arrested on January 17, 1997. In a statement to police, Cross admitted shooting Slaughter but claimed that he acted in self-defense. According to Cross, he was at Grayson's apartment, a gathering place for members of the Bloods gang, on the evening of January 11, 1997. At approximately 9 p.m., Slaughter arrived, spoke with a man known as "Snap" in the hallway, and then left. Snap told Cross that Slaughter was going to East New York to get his gun and would return to rob and shoot Cross. To avoid trouble, Cross left the apartment. He returned shortly after midnight to find Grayson, Snap, and several other individuals gathered in the living room. Snap motioned to the back bedroom to signal that Slaughter was there, so Cross left again.

Cross told investigators that he returned to Grayson's apartment at 1:30 a.m. to retrieve clothing, this time accompanied by his friend "Flex." Wilks opened the front door and indicated that Slaughter was in the back bedroom of the apartment. Cross and Flex went to the back bedroom to confront Slaughter. They found Slaughter accompanied by Ezell, who was known as "Blueberry." As Cross and Slaughter began to argue, Ezell left the room, and the dispute soon escalated to violence:

> I asked Rah why was he trying to rob me, I never had problems
> with him. Rah said, I don't even know[] you, I'm trying to find
> out about you. Rah turns towards the window, at that time I
> realized Flex was to my left, I see Rah stand up from the couch, I
> see Rah reach into his waist and pull a black gun, as I see Rah
> reaching, I drop my gun from my left sleeve and pull 'SHOT,' then
> I see Felx [sic] shoot, everything happened so quick. Rah crouched
> on the bed, he had his gun[ ]out, me and Flex ran into the bathroom
> afraid Rah was going to shoot. When we get into the bathroom,
> Rah runs right past me and Flex . . . and out the door.

Pet.'s Ex. B at 3.

3

In response to further questioning, Cross told police that Flex's real name was John and that John lived next door to him at 378 Monroe Street in Brooklyn. Police connected 378 Monroe Street to petitioner John Trisvan and, on January 17, 1997, they went to that address to arrest him. Trisvan's mother answered the door and told police that Trisvan was staying with a girlfriend. Trisvan asserts that he had been in Philadelphia since January 15, on what he claims was a previously scheduled trip.

Trisvan asserts that he learned that he was a suspect in Slaughter's death when he returned to New York in May 1997. After consulting with his mother and pastor, Trisvan turned himself in at the 79th precinct at 10 p.m. on May 11, 1997. He initially told detectives that he was home watching television with his family on the night of the shooting. Trisvan was then taken to the 77th precinct, where he was placed in an investigation room. At approximately 1 a.m., two detectives began questioning him about the shooting. According to Trisvan, the detectives told him that they had overwhelming evidence against him, that his alibi would not stand up in court, and that he would likely spend his life in jail if he did not confess. At approximately 4 a.m., Trisvan admitted to participating in the shooting. One of the detectives then asked Trisvan to write down his statement.

In his signed written statement, Trisvan recounts that he accompanied Cross, who he refers to as "Main," to an eighth-floor apartment in the Albany Houses in the early morning hours of January 12, 1997. Shortly after they arrived, Cross began to argue with Slaughter who had been in the back bedroom. Ezell, who Trisvan knew as "Raspberry" or "Berry," came into the living room and sat down on the couch next to Trisvan. After the argument died down, Ezell and Slaughter returned to the back bedroom. From the living room, Cross and Trisvan could

4

hear Slaughter saying that Cross should come to the back room and handle his business. Trisvan's statement then reads:

> Me and Main had got out [sic] the couch and prepared to walk to the back door. Then Main and the dude began arguing again. All [sic] that time the girl Berry left so it was just me, Main and the dude. So the dude said 'yo,' we can handle it any way you want. With the hand or the gats, meaning gun.
>
> So at that time he was reaching and then Main had pulled out and the dude was pulling out. Main pulled out this chrome nine, nine millimeter, and when I saw the dude pulling out I pulled out a .44 revolver. Main started firing and I shot one time. The dude ducked and I had shot a second time. The dude rolled on the bed to his feet.
>
> At that time Main was still firing. The dude ran out the apartment and we left through the stairway out the projects and back to Main's crib.

Trial Tr. 552:10–552:25.

At 4:40 a.m., Trisvan made a videotaped statement to an assistant district attorney, in which he again admitted his involvement in the shooting. He added that he went to the Albany Houses with a loaded .44 caliber revolver, that Cross was carrying a nine-millimeter gun, and that the victim never fired a shot.

After Trisvan confessed, police conducted a physical lineup with eyewitness Wilks, who had previously identified Trisvan from a photographic array. Wilks once again identified Trisvan as Cross's accomplice. Ezell also participated in a lineup but was unable to identify either Trisvan or Cross.

Trisvan was subsequently charged with two counts of murder in the second degree in violation of New York Penal Law §§ 125.25[1]–[2], and one count each of criminal possession of a weapon in the second and third degrees in violation of New York Penal Law §265.03 and 265.02(4). Trisvan's and Cross's trials were severed.

5

## B. Trisvan's Trial

At trial, Wilks gave his eyewitness account of the shooting. He testified that he allowed Cross and Trisvan into Grayson's apartment around 2:00 a.m. on January 12, 1997. Wilks claimed that he asked Cross to relinquish his gun, but Cross refused and proceeded to the back bedroom, which Slaughter was occupying with Ezell. Trisvan and Wilks followed. When Wilks, Cross and Trisvan entered the back bedroom, Ezell ran from the room, and Cross and Slaughter immediately began to argue. Cross then brandished a gun. Wilks rushed into the kitchen to grab a butcher's knife. Wilks testified that, when he returned to the room, Trisvan turned to Cross, said "let's do this," pulled out a gun and shot Slaughter in the chest. Wilks then retreated to the closet where he witnessed Cross and Trisvan shoot Slaughter additional times and shove him around the room. Cross and Trisvan then exited the room and Wilks told Slaughter that he would get him out of the apartment, whereupon Cross reentered and fired a shot towards Slaughter's head. At this point Wilks pushed himself deeper into the closet where he had limited visibility. He heard sounds of further struggle, and when he emerged from the closet, no one remained in the room.

The prosecution also introduced Trisvan's written and videotaped confessions, in which Trisvan admitted to the shooting but characterized it as an act of self-defense. Detective Danchuk, who took Trisvan's written statement, testified that he questioned Trisvan about the shooting only after advising him of his *Miranda* rights and did not try to influence the content of Trisvan's statement.

The prosecution also relied on forensic and ballistics experts to establish the manner of Slaughter's death. Detective James Gannalo, a ballistics expert, testified that the police found nine-millimeter and .38 caliber bullets and shell casings and that both types of bullets could be fired from a nine-millimeter semi-automatic gun. He also explained that a .44 caliber revolver,

6

as Trisvan was alleged to have carried, would not have left shell casings. Detective Gannalo acknowledged that the police did not recover any .44 caliber bullets, but testified that he could not identify several bullet fragments, which potentially could have come from a .44 caliber gun.

Trisvan did not testify, and his appointed attorney, Frank Paone, Esq., did not call any witnesses. Trisvan's counsel presented a justification defense, arguing that Trisvan shot Slaughter in self-defense after Slaughter reached for a gun.

On November 19, 1997, the jury found Trisvan guilty of manslaughter in the first degree, but acquitted him of the second-degree murder charges and weapons possession offenses. He was sentenced on December 11, 1997 to twelve-and-one-half to twenty-five years' imprisonment.[2]

### C. Direct Appeal and State Habeas Proceedings

Trisvan's conviction was upheld by the Appellate Division, Second Department, and Trisvan was denied leave to appeal to the New York Court of Appeals. *People v. Trisvan*, 280 A.D.2d 563 (2001), *leave to appeal denied*, 96 N.Y.2d 869 (2001). Trisvan did not seek a writ of *certiorari*. His conviction became final on or about March 17, 2002.

The record does not reveal when Trisvan filed his first application for collateral relief in state court. The application was, however, denied by order dated December 19, 2003. Trisvan filed three additional state collateral applications before seeking habeas relief in this court.

---

[2] After a separate jury trial, Cross was convicted of one count of manslaughter in the first degree and one count of criminal possession of a weapon in the second degree. As a second violent felony offender, he was sentenced to consecutive terms of imprisonment of fifteen years for the manslaughter offense and five years for the weapons possession offense. The Appellate Division, Second Department, affirmed his conviction, *People v. Cross*, 257 A.D.2d 663 (2d Dep't 1999), and the Court of Appeals denied his application for leave to appeal, 93 N.Y.2d 968 (1999). The Hon. Jack B. Weinstein, district judge, denied Cross's petition for a writ of habeas corpus. *Cross v. McGinnis*, 2003 WL 21812024 (E.D.N.Y. July 23, 2003).

These additional state applications were denied in their entirety, the last by order dated June 23, 2005. Trisvan did not appeal that denial by the July 23, 2005 deadline for doing so. *See* N.Y.C.P.L.R. §§ 5513(a), 7011.

**D. Federal Habeas Petition**

November 1, 2007, more than two years after the denial of his last state collateral application, Trisvan filed a *pro se* petition in this court for a writ of habeas corpus under 28 U.S.C. § 2254. Trisvan claims that his confession was obtained in violation of his due process rights; the pretrial identification process, in which Wilks identified him as one of the two gunmen, was impermissibly suggestive; the prosecution withheld evidence regarding Wilks's cooperation agreement and failed to produce a purportedly exculpatory fingerprint report; and his trial and appellate counsel were constitutionally ineffective.

The court directed Trisvan to show cause why his petition was not time-barred by AEDPA's one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1).[3] After obtaining the assistance of counsel, Trisvan acknowledges that his petition was not filed within AEDPA's limitations period. Trisvan does not contend that the petition was timely by operation of statutory tolling, *see id.* § 2244(d)(2),[4] or that the limitations period was equitably tolled by "extraordinary circumstances" that prevented timely filing. *See Holland v. Florida*, 560 U.S. 631, 649 (2010) (delineating elements of equitable tolling).

---

[3] AEDPA's limitations period begins to run from latest of several triggering events, including, as relevant here, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). Petitioner does not contend, and there is no basis in the record to conclude, that any other triggering event applies here.

[4] Trisvan cannot invoke statutory tolling because, at a minimum, he did not have a state collateral proceeding pending between July 23, 2005 and November 1, 2007. *See id.* § 2244(d)(2) (limitations period tolled only during period in which state collateral proceeding is "pending").

The sole issue then is whether Trisvan is exempt from AEDPA's statute of limitations because evidence not presented at his trial establishes his "actual innocence." According to Trisvan, he was at home watching television on the night of the shooting. He contends that his appointed counsel refused to advance this alibi at trial and that certain evidence not presented to the jury demonstrates his innocence.

First, Trisvan asserts that he is exonerated by a May 2008 affidavit from his co-conspirator Cross, in which Cross asserts that Trisvan was not his accomplice. To buttress this claim, Trisvan offers an affidavit from Victoria Levin, a member of Trisvan's legal team, recounting similarly exculpatory statements that Cross made to her in a May 2008 prison interview. Although Cross led police to Trisvan in the wake of the shooting,[5] he now asserts that his accomplice "fit a very different physical description than Mr. Trisvan," and that Trisvan was a "mama's boy" who never would have been allowed to enter a Bloods hangout like Grayson's apartment. *See* Pet.'s Ex. B at 9–10. Cross admits that he told police that his accomplice was named Flex, but he now claims in his affidavit that "[t]he arresting officers told me the guy I was with was named Flex," and that he agreed with this suggestion only because Flex was a popular street name for gang members at the time and he was "tr[ying] to be as cooperative and obliging as possible." *Id.* at 7, 9. Cross asserts that he never thought police were using "Flex" to refer to his neighbor Trisvan. *Id.* at 9.

Second, although Trisvan confessed to shooting Slaughter, he claims that his confession was "concocted from the information he was fed" by police and that inconsistencies between his confession and corroborated details of the crime actually support his innocence. *See* Supp. Mem.

---

[5] Cross's initial statements implicating Trisvan were not introduced at trial and thus did not contribute to the jury's finding of guilt.

at 12. For instance, in his confession, Trisvan stated that he never knew Cross to carry a gun, whereas several witnesses indicated that Cross was habitually armed. Similarly, in his confession, Trisvan indicated that Slaughter argued with Cross in the living room before moving to the back bedroom, but other witnesses interviewed by police never mentioned this living room exchange. Finally Trisvan claims that his confession is incompatible with the physical evidence because he confessed to shooting Slaughter in Grayson's back bedroom with a .44 caliber gun, but no .44 caliber bullets or blood were found in that room.

Third, Trisvan claims that he is not affiliated with the Bloods gang and that, according to Cross and other witnesses interviewed by police, Grayson's apartment was a hangout for Bloods. Trisvan's argument, in short, is that he could not have been involved in a gang-related shooting.

Fourth, Trisvan contends that Wilks's eyewitness account of the shooting is not credible because none of the other individuals present at Grayson's apartment that evening testified at trial, and one of those individuals, Ezell, was unable to identify Trisvan in a lineup.

Finally, Trisvan argues that his innocence is established by a police report, completed several days after the conclusion of his trial, showing that there were no matches between Trisvan's fingerprints and latent prints found at the scene of the crime.

## II. DISCUSSION

### A. The Actual Innocence Gateway

At the time Trisvan filed his habeas petition, it was uncertain whether a showing of actual innocence provided an exception to AEDPA's statute of limitations. The Second Circuit subsequently recognized the exception in *Rivas v. Fischer*, 687 F.3d 514, 548–53 (2d Cir. 2012), and the Supreme Court followed suit in *McQuiggin*, holding that "a convincing showing of actual innocence" serves as an equitable gateway allowing a prisoner to pursue his constitutional

claims on the merits notwithstanding their untimeliness. *See* 133 S. Ct. at 1928.[6] This "fundamental miscarriage of justice exception[] is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 1931 (internal quotation marks omitted).

To pass through the "actual innocence" gateway, a petitioner must make the same showing of actual innocence required to overcome a procedural bar to habeas review under the miscarriage of justice prong. *See McQuiggin*, 133 S. Ct. at 1928. The standard is "'demanding' and seldom met." *Id.* (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). A claim of actual innocence "must be both 'credible' and 'compelling.'" *Rivas*, 687 F.3d at 541 (quoting *House*, 547 U.S. at 521, 538). "For the claim to be 'credible,' it must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Id.* (quoting *House*, 547 U.S. at 538); *see also McQuiggin*, 131 S. Ct. at 1931. Evidence "not heard by the jury" is considered "new evidence" for these purposes even if it was available at the time of trial. *Id.* at 543.

The Supreme Court has contrasted the standard governing an actual innocence gateway claim with the more familiar standard for a legal sufficiency claim under *Jackson v. Virginia*,

---

[6] The actual innocence "gateway" is a vehicle to reach the merits of a habeas petition. The Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence," *id.* at 1931, and petitioner has not asserted such a freestanding claim here.

11

443 U.S. 307 (1979). The actual innocence gateway standard differs from the legal sufficiency standard in two key respects. First, under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "Under *Jackson*, the use of the word 'could' focuses the inquiry on the *power* of the trier of fact to reach its conclusion," whereas "the use of the word 'would'" in the actual innocence context "focuses the inquiry on the *likely* behavior of the trier of fact.'" *Schlup*, 513 U.S. at 330 (emphases added). The actual innocence standard thus "requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.

Second, under *Jackson*, the court "is limited to considering the evidence actually presented at trial, and must view that evidence in the light most favorable to the prosecution." *Rivas*, 687 F.3d at 542. By contrast, because a gateway claim of actual innocence "involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538. Because the focus is on "actual innocence" and not the legal sufficiency of the evidence, the court must "consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* "If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." *Id.* at 538–39 (internal quotation marks omitted).

Contrary to respondent's contention here, a threshold showing of due diligence is not required to assert a viable claim of actual innocence. *See McQuiggin*, 133 S. Ct. at 1935. Nevertheless, "[u]nexplained delay in presenting new evidence bears on the determination

whether the petitioner has made the requisite showing" because delay can "seriously undermine the credibility of [an] actual innocence claim." *Id.* at 1935–36.

### B. Trisvan's Actual Innocence Claim Is Neither Credible Nor Convincing

The centerpiece of Trisvan's actual innocence claim—Cross's exculpatory affidavit—must be viewed "through a lens of heightened skepticism and suspicion," as Cross "was involved in the same criminal scheme and ... now sits in jail with nothing to lose by recanting" his statements to police incriminating Trisvan. *See Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007). Cross offers this testimony only after his own judgment of conviction became final and after he had exhausted all avenues to challenge his conviction. Moreover, the credibility of Cross's assertions is undermined by his failure to name the person he claims was his actual accomplice. Under these circumstances, Cross's proffered testimony, which serves only to exonerate Trisvan without implicating a different perpetrator, "'must be looked upon with the utmost of suspicion.'" *Id.* (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003)).

Skepticism is also warranted by Cross's failure to convincingly explain why he waited more than ten years to exculpate Trisvan. *See McQuiggin*, 133 S. Ct. at 1935. Although Cross asserts that he contacted Trisvan's counsel before trial to offer his assistance in clearing Trisvan's name and that his own counsel advised him not to testify on Trisvan's behalf, Trisvan does not present an affidavit from either attorney corroborating these claims. Even if Cross is to be believed, nothing stopped him from coming forward after his trial to exonerate Trisvan. He did not do so. Trisvan contends that, because he was proceeding *pro se* until only recently, he cannot be faulted for failing to procure Cross's affidavit at an earlier point in time. But even if Trisvan's *pro se* status justified his delay, it does not adequately explain Cross's.

13

Even without heightened skepticism, Cross's exculpatory statements are implausible on their face. Cross claims that police told him that his accomplice was known as "Flex," a name that he did not associate with his neighbor Trisvan. In his post-arrest statements to police, however, Cross did not simply accept that Flex was his accomplice. He told police that Flex's real name was John and that John lived next door to him at 378 Monroe Street in Brooklyn. Police connected that address to John Trisvan and, when they went there, they spoke with Trisvan's mother. Cross never explains why, if petitioner was not his accomplice, he gave Trisvan's name and address to police when they questioned him about Flex's identity.

Cross also now claims that Trisvan fit a different physical description than that of his accomplice. Cross asserts that his accomplice "was 6'1["], light skin, slim with braids." Pet.'s Ex. B at 5. A reasonable juror, however, would afford this assertion little weight given that Cross does not identify the actual perpetrator or explain why he previously identified Trisvan. In any case, Cross's description of Trisvan as "fat [and] kind of short," *id.*, is not inconsistent with Wilks's description of the second shooter as approximately 5'7" tall, and Wilks identified Trisvan as Cross's accomplice from both a photographic array and a physical lineup.

Trisvan's remaining new evidence does not engender reasonable doubt as to his guilt. While Trisvan has identified purported inconsistencies between his confession and other aspects of the record, the inconsistencies do not undermine the confession's probative force, let alone establish Trisvan's innocence. *See Diaz v. Bellnier*, 974 F. Supp. 2d 136, 145 (E.D.N.Y. 2013) (inconsistencies between petitioner's confession and record did not "move the case into the realm in which no reasonable juror would have found guilt beyond a reasonable doubt"). Several of the inconsistencies relate to marginal details—for example, whether Cross always carried a gun or whether Trisvan and Cross spoke with Slaughter in the living room of Grayson's apartment

14

before the shooting. At most, these inconsistencies indicate that Trisvan, who confessed four months after the shooting, lacked perfect recollection or shaded his statements to police to make the shooting appear less premeditated.

Asserted inconsistencies between Trisvan's confession and the physical evidence are equally unavailing. It is true that, although Trisvan confessed to using a .44 caliber weapon to shoot Slaughter in Grayson's back bedroom, no .44 caliber bullets or blood were discovered there (blood was found in Grayson's living room). The ballistics evidence, however, revealed several deformed slugs in the back bedroom that could have come from a .44 caliber revolver, and there is no dispute that Slaughter was shot in that room. In addition, Ezell told police that Grayson cleaned the back bedroom prior to the police's arrival, which could explain the absence of .44 caliber bullets and blood.

Trisvan's actual innocence claim also draws little support from his assertion that he was not involved with the Bloods gang. The only evidence that Trisvan was not affiliated with the Bloods comes from Cross's highly suspect affidavit. More fundamentally, there is no reason to conclude that only a Blood could have committed the offense. Trisvan appears to rely on Cross's assertion that only Bloods were permitted to enter Grayson's apartment. That claim, however, is belied by witness statements indicating that Cross's accomplice was allowed to enter the apartment even though he was unknown to alleged Bloods occupying it at the time.

Trisvan's reliance on Ezell's failure to identify him in a lineup is similarly misplaced. Trisvan omits that Ezell, who was fifteen at the time of the shooting, also was unable to identify Cross, and there is no dispute that Cross was involved. A reasonable juror would likely conclude that Ezell either had limited recollection of the perpetrators or was unwilling to identify them, not that Trisvan is innocent.

Questioning the credibility of Wilks's eyewitness account, Trisvan stresses that Wilks was the only individual at Grayson's apartment to testify for the prosecution. But there is no evidence that the other individuals could exonerate Trisvan. As already discussed, Cross's efforts to exculpate Trisvan are neither credible nor convincing. Two of the other individuals present—Jackson and Wallace—told police that they remained in the front bedroom of Grayson's apartment when the shooting occurred and thus never had an opportunity to identify Cross's accomplice. Ezell told investigators that she did not recognize the accomplice. And while Grayson did not mention an accomplice in her police interview, there is no dispute that two shooters were involved. Cross admits in his most recent affidavit, on which Trisvan predicates his actual innocence claim, the existence of a second gunman.

Finally, that Trisvan's fingerprints did not match any of the latent prints recovered from the crime scene would not persuade a reasonable juror to acquit. Wilks told police that Trisvan was wearing latex gloves, at least on his trigger hand, and Ezell told police that Cross's accomplice kept his hands in his pockets while in the apartment. In addition, police were able to recover only eleven latent prints from the apartment, even though at least eight people had been at the apartment on the night of the shooting.

In sum, the new evidence Trisvan offers provides scant, if any, support for his actual innocence. Moreover, the new evidence cannot be viewed in isolation. It must be arrayed against the forceful evidence supporting the jury's guilty verdict. *See House*, 547 U.S. at 538 (exculpatory and inculpatory evidence must be considered to assess actual innocence).

Notably in this respect, Wilks identified Trisvan as Cross's accomplice (from both a photographic array and a physical lineup) and testified that he saw Trisvan pull out a revolver and shoot Slaughter in the chest. Wilks's identification of Trisvan is supported by the ample

16

opportunity he had to observe Trisvan on the night of the shooting. Wilks opened the door for Cross and Trisvan when they arrived at Grayson's apartment. Wilks was present in the back bedroom when Cross and Slaughter argued, and he witnessed the shooting from inside the room and its adjoining closet. Moreover, Wilks's trial testimony conforms to his statements to police on the day of the shooting, before police had focused on Trisvan as one of the two gunmen; it comports with Ezell's account of the events leading up to the shooting; and it is substantially corroborated by Trisvan and Cross's own confessions.

Trisvan contends that Wilks testified in exchange for favorable treatment from prosecutors in a separate criminal proceeding. In that proceeding, Wilks had pleaded guilty to intimidating a witness and, at the time of Trisvan's trial, awaited sentencing. This is not a new claim. At Trisvan's trial, Wilks openly admitted that he hoped to have his plea reopened and his offense reduced from a felony to a misdemeanor.[7] Trisvan's counsel devoted much of his summation to challenging Wilks's credibility, emphasizing Wilks's lengthy criminal history. Having been presented to the convicting jury, the possibility that Wilks testified untruthfully to curry favor with his prosecutors does not constitute "new evidence" for purposes of establishing Trisvan's actual innocence.

Moreover, even without Wilks's testimony, the prosecution adduced ample evidence of Trisvan's guilt. Most significantly, Trisvan confessed his involvement in the shooting, in writing and on videotape, shortly after his arrest. He admitted that he accompanied Cross to Grayson's apartment, that he was armed with a .44 caliber revolver, that Cross had a nine-millimeter pistol, and that he and Cross shot Slaughter.

---

[7] The prosecutor that negotiated Wilks's plea agreement in the separate action testified at Trisvan's trial. She told the jury that Wilks did not receive favorable treatment in exchange for his testimony and that Wilks's plea agreement would not be renegotiated.

17

Finally, the weakness of Trisvan's actual innocence claim is underscored by his failure to adduce evidence supporting his asserted alibi. Although Trisvan claims that he was at home watching late night television with his family on the night of the shooting, he does not present any testamentary or documentary corroboration of that claim. In any case, given Trisvan's confession and eyewitness testimony placing him at the scene of the crime, the family member alibi affidavits that Trisvan has tellingly failed to submit would not compel a reasonable juror to acquit. *See Philbert v. Brown*, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) (alibi affidavits from petitioner's girlfriend and his girlfriend's mother could not establish actual innocence in light of eyewitness testimony identifying petitioner as perpetrator); *Lawrence v. Greene*, 2011 WL 1327128, at *7 (E.D.N.Y. Mar. 31, 2011) (rejecting actual innocence claim where "other evidence presented against Petitioner at trial might prompt a reasonable juror to conclude that Petitioner participated in the robbery despite the alibi provided by Petitioner's friends and relatives").

## III. CONCLUSION

For the foregoing reasons, and based on the entirety of the record, the court concludes that Trisvan has not established that it is more likely than not that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 133 S. Ct. at 1928 (internal quotation marks omitted). Accordingly, Trisvan cannot overcome the one-year statute of limitations, and his petition for a writ of habeas corpus is dismissed as untimely under 28 U.S.C. § 2244(d)(1).

Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See id.* § 2253(c)(2). The court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* relief is denied for the purpose of any appeal. *See Coppedge v.*

*United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

s/Nina Gershon

NINA GERSHON
United States District Judge

Dated: Brooklyn, New York
January 30 , 2015

19